**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA; the States of:  :
CALIFORNIA, DELAWARE, FLORIDA,         :
GEORGIA, HAWAII, IOWA, LOUISIANA,      :
MASSACHUSETTS, MICHIGAN, NEVADA,       :
NEW JERSEY, NORTH CAROLINA,            :      MEMORANDUM DECISION
RHODE ISLAND, TENNESSEE, TEXAS,        :          AND ORDER
VIRGINIA, and the DISTRICT OF          :
COLUMBIA, ex rel. KAVEH ASKARI,        :        20 Civ. 5089 (GBD)

                            Plaintiffs,   :

          -against-                       :

PHARMERICA CORPORATION,                :
PHARMACY CORPORATION OF AMERICA,       :
ONCOMED SPECIALTY PHARMACY, LTD.,      :
d/b/a ONCO360, and GREG WEISHAR, PAUL  :
JARDINA, and ROBERT THOMSON,           :
in their individual capacities,        :

                            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

Relator Plaintiff Kaveh Askari brings this *qui tam* action against Defendants PharMerica Corporation ("PharMerica"), Pharmacy Corporation of America ("PCA"), OncoMed Specialty Pharmacy, Ltd., d/b/a Onco360 ("Onco360"), Gregory Weishar ("Weishar"), Paul Jardina ("Jardina") and Robert Thomson ("Thomson") alleging violations of the federal False Claims Act ("FCA"), as well as analogous statutes in sixteen states and the District of Columbia. (First Amended Complaint ("FAC"), ECF No. 14, ¶¶ 109-223.)   Defendants allegedly engaged in schemes to submit false claims for prescription drugs, including claims to participating Medicare and Medicaid providers. (*See Id.*)  Neither the Government nor any State exercised its authority to intervene in this action. Defendants now move to dismiss the FAC for failure to state a claim pursuant to Federal Civil Rule 12(b)(6) and 9(b). The motion to dismiss is GRANTED.

## I.   FACTUAL BACKGROUND

### A.  Relevant Healthcare Laws and Regulations

Before detailing the facts, it is important to describe the relevant healthcare and pharmacy regulatory landscape.  The federal government helps provide for two healthcare programs – Medicare and Medicaid.  The programs try to alleviate the burden of healthcare costs, including prescription drugs, for the elderly, indigent, and disabled.  *See* 42 U.S.C. §1395 *et seq.*; 42 U.S.C. §§1396 *et seq.*  Both programs allow for approved insurance or private companies (known as Part D sponsors) to reimburse pharmacies for drug costs.  These Part D sponsors (or a third party known as PBMs) enter contracts with pharmacies for the price of drugs.  The dispensing pharmacy submits a claim for payment to the Part D Sponsor or PBM using the pharmacy's unique National Provider Identifier ("NPI").  *See* 42 C.F.R. §§ 423.120(c)(5)(i).  A valid claim requires a valid prescription. In turn, a valid prescription requires the dispensing pharmacy to comply with applicable federal and state laws.  *See, e.g.*, 42 C.F.R. §423.100 and 42 C.F.R. §423.104(h).  While Medicaid is a joint federal-state program, it provides similar support for qualified individuals and imposes similar requirements on participating pharmacies.  *See generally*, 42 U.S.C. §1396 et seq.

State requirements vary on when out-of-state pharmacies can dispense prescriptions under Medicare or Medicaid.  For Medicare, an out-of-state pharmacy only needs a valid license and registration in another state.  (FAC at ¶ 53.)  Medicaid is more convoluted.  Some states only require an out-of-state pharmacy to register with the state's Medicaid agency, while other states require the pharmacist in charge ("PIC") of the out-of-state pharmacy to obtain a license from the state.  (*Id.* at ¶¶ 54-55.)  In addition, some states require an out-of-state pharmacy have a physical location in the state *and* a PIC that is licensed in the state, while other states only require a physical location in the state.  (*Id.* at ¶¶ 56-57.)

2

The federal government also enacted a drug pricing program known as 340B. *See* 42 U.S.C. § 256b. The program is tied to Medicaid and requires pharmaceutical "manufacturers participating in Medicaid [to] offer discounted drugs to covered entities," known as Disproportionate Share Hospitals ("DSH Hospitals"). *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110 (2011). "DSH hospitals contract with certain pharmacies to provide drugs covered by the 340B program." (FAC at ¶ 39.) Drugs purchased under the 340B program are reimbursed under Medicare programs. *See, e.g.*, 82 Fed. Reg. 52361 (Nov. 13, 2017) ("We are changing our current Medicare Part B drug payment methodology for 340B hospitals…").

### B. Factual Background

Relator Askari is a pharmacist who specializes in oncology drugs. (FAC at ¶ 11.). In 2002, he founded Defendant Onco360—a retail oncology pharmacy that manages all aspects of a patient's oncology pharmaceuticals. (*Id.* at ¶¶ 12, 18, 58.) While he was employed at Onco360, Askari was the PIC. (*Id.* at ¶¶ 59.) Askari has an out-of-state license in Kentucky, Louisiana, Maryland, Mississippi, Nebraska, and Tennessee. (*Id.* at ¶ 67.) Another supervising pharmacist at the pharmacy was Scott Feigles. (FAC at ¶ 60.) Feigles has an out-of-state license in Alabama, Arkansas, Michigan, Oregon, North Carolina, Virginia, and West Virginia. (*Id.* at ¶ 67.) Across the country, Onco360 provides pharmaceutical services to Medicare and Medicaid beneficiaries, contracts with pharmaceutical manufacturers, and contracts with seven 340B hospitals. (*Id.* at ¶¶ 61-63, 72-73.) Onco360 has physical locations in New York (Great Neck and Buffalo), Pennsylvania, Massachusetts, and New Jersey. (FAC at ¶ 65.)

In December 2013, Defendant PCA purchased a minority interest in and secured managerial and operational control of Onco360. (*Id.* at ¶¶ 12, 18, 76.) PCA is a wholly owned subsidiary of Defendant PharMerica. (*Id.* at ¶ 17.) PharMerica is a long-term and post-acute care

pharmacy specializing in senior living settings, including assisted living and nursing facilities. (*Id.* at ¶ 16.)  From 2007 through 2019, Defendant Gregory Weishar was the CEO of PharMerica. (FAC at ¶ 19.)  From 2014 through 2020, Defendant Paul Jardina was the CEO and President of Onco360. (*Id.* at ¶ 20.)  During the relevant time period, the Vice President in charge of sales at Onco360 was Defendant Robert Thomson. (*Id.* at ¶ 21.)

Onco360 terminated Askari in May 2014 and Feigeles in July 2014. (FAC at ¶¶ 81, 83.) This resulted in Onco360 losing its license to dispense prescriptions in Kentucky, Louisiana, Maryland, Mississippi, Nebraska, Tennessee, Arkansas, Michigan, Oregon, North Carolina, Virginia, and West Virginia. (*Id.*)  Onco360 was at an impasse and allegedly engaged in three different schemes starting in May 2014 to resolve the issue:

1. *The Work Around*: Onco360 accepted, filled, and billed for prescriptions from states it no longer had a license, then shipped the medications to PharMerica pharmacies that had a license in the relevant state.  After reviewing and checking the prescription, PharMerica dispensed the medication to the customer.  (FAC at ¶ 86.)

2. *Onco Manage PharMerica Dispense* ("OMPD"):  This was a more permanent version of the work around.  However, instead of Onco360 billing for the prescriptions, Onco360 submitted claims using PharMerica's NPI because PharMerica was the actual dispensing pharmacy.  (FAC at ¶ 98.)

3. *Overbilling*:  Since PharMerica was dispensing the prescriptions, it submitted claims based on its own contracts with PBMs.  PharMerica's contracts provided for reimbursement at the higher long-term care patient rate rather than the lower rate for retail customers.  However, Onco360 only served retail customers.  (FAC

4

at ¶¶ 105-06.). Therefore, PharMerica was seeking a windfall by billing for the higher rate than the service it actually provided.

On July 8, 2020, Askari filed a *qui tam* complaint against the Defendants on behalf of the United States and thirty states/federal territories alleging that these three schemes violated the FCA and similar state statutes. (Complaint, ECF No. 8.) All governmental entities declined to intervene in this action. (*See* Federal Notice of Election to Decline Intervention, ECF No. 10; States' Notice of Election to Decline Intervention, ECF No. 11.) On October 1, 2021, Plaintiffs filed the Amended Complaint on behalf of the United States and 16 states. Defendants moved to dismiss for a failure to state a claim. (ECF No. 44.)

## II.   LEGAL STANDARD

Generally, complaints only need to "state[] a claim for relief [that] contain[s]…a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) For the complaint "[t]o survive a motion to dismiss, [it] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To state a facially plausible claim requires the plaintiff to plead facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The factual allegations pled must therefore "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). In deciding the 12(b)(6) motion, the court must also draw all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119–20 (2d Cir. 2013). In examining the complaint, a district court disregards conclusory statements. The court only considers, and assumes to be true, the plaintiff's remaining well-pleaded factual allegations. *Iqbal*,

5

556 U.S. at 679; *see also Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909 (SAS), 2013 WL 6087400, at *3 (S.D.N.Y. Nov. 19, 2013).

However, "*[q]ui tam* complaints filed under the FCA, because they are claims of fraud, are subject to Rule 9(b)." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (citing *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26 (2d Cir. 2016)). Rule 9(b) imposes a "heightened pleading standard, that requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *United States v. Omnicare, Inc.*, 2021 WL 1063784, at *8 (S.D.N.Y. Mar. 19, 2021.) "This ordinarily requires a description of (1) the specific statements that are alleged to be fraudulent; (2) the identity of the speaker; (3) where and when the statements were made; and (4) why the statements were fraudulent." *Omnicare, Inc.*, 2021 WL 1063784 at *8 (citing *Chorches*, 865 F. 3d at 81); *see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1997) (internal quotation marks and citation omitted) ("At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud.").

## III.    THE QUI TAM COMPLAINT IS NOT ADEQUATELY PLED

Askari brought FCA allegations against the Defendants pursuant to 31 U.S.C. §§ 3729(a)(1)(A) and (B).[1]  Defendants are liable if they "knowingly present[ed] or cause[d] to be presented, a false or fraudulent claim for payment or approval" or "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). This requires that Askari have alleged Defendants "(1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity,

---

[1] Askari's allegations against PCA are dismissed for lack of particularity. The FAC is devoid of any substantive allegations against PCA directly. The only factual allegation against PCA is that it owns Onco360. (FAC at ¶¶ 1, 17-18.) Not one executive at PCA is personally mentioned in the complaint. Rule 9(b) requires more than merely alleging a parent-subsidiary relationship.

and (5) seeking payment from the federal treasury." *Coyne v. Amgen, Inc.*, 717 F. App'x 26, 28 (2d Cir. 2017); *see also Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001), *abrogated on other grounds by Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016). The misrepresentation also must have been material to the Government's payment decision. *Escobar*, 579 U.S. at 191.

Furthermore, Rule 9(b) requires Askari to plead "both the fraudulent scheme and the submission of false claims with a high degree of particularity." *United States ex rel. Ramos v. Icahn Sch. of Med. at Mt. Sinai*, 2015 WL 5472933, at *4 (S.D.N.Y. Sept. 16, 2015); *see also United States ex rel. O'Toole v. Cmty. Living Corp.*, 2020 WL 2512099, at *8 (S.D.N.Y. May 14, 2020) ("Rule 9(b)'s particularity requirement applies not just to allegations of fraudulent schemes, but also to the submission of false claims."). This includes the specific laws or requirements that Defendants failed to comply with in submitting their claims for payment from Government payors. *See Escobar*, 579 U.S. at 188 (discussing whether submitting a claim without disclosing violations of statutory, regulatory, or contractual requirements constitutes such an actionable misrepresentation); *Chorches*, 865 F.3d at 83-84 (finding specific detail in the complaint about Defendants falsifying records to demonstrate "medical necessity" as defined under Medicaid regulations for reimbursement); *Ramos*, 2020 WL 2512099 at *5 ("Relators have not alleged sufficient facts to demonstrate that... failure to follow the eligibility criteria was a bar to grant funding.").

The FAC is dismissed because it fails to particularly allege any claim to the Government was false.[2]  The FAC alleges Defendants engaged in three different practices of knowingly

---

[2] Defendants argue that the FAC does not allege with particularity there was a claim made to the Government or the individuals Defendants were involved. Askari can meet his Rule 9(b) burden by making "allegations...based on information and belief when facts are peculiarly within the opposing party's knowledge," if the facts alleged provide a strong inference that claims were submitted. *Chorches*, 865 F. 3d at 81. Here, the schemes began in May 2014,

submitting false claims to Government payors: the work around scheme, the OMPD program, and overbilling. (FAC at ¶¶ 85–108.) While the FAC speculates a complex scheme by the Defendants to address immediate business problems, the allegations are scant and a far cry from meeting the particularity requirement for why the claims are false. This is because the FAC fails to allege which laws, regulations, or requirements Defendants failed to comply with making the scheme fraudulent or claims false.

## A. The Work Around and OMPD Program

The Work Around and OMPD program are similar in that both concern whether Onco360 violated state pharmacy licensing rules by filling and sending prescriptions to PharMerica for it to review and dispense to patients in states where PharMerica was licensed, but Onco360 was not. (FAC at ¶¶ 86-87, 96.) The difference between the two schemes is that the Work Around was temporary program in which Onco360 was personally billing the government, and OMPD was a permanent system where Onco360 submitted claims using its PharMerica's NPI. (*Id.*) Defendants contend that Askari has failed to meet his heightened pleading burden in alleging falsity because there is no legal requirement proscribing their actions. (Defs.' Mem of Law in Support of Mot. to Dismiss, ECF No. 45, at 14.) Their argument relies on the proposition that the alleged scheme was nothing more than a creative legal solution to a business problem. The gravamen of Askari's argument is that Onco360 falsely certified its compliance with applicable state pharmacy regulations because it was the actual dispensing pharmacy—not PharMerica as asserted—and Onco360 did not have the proper licensing to dispense in the relevant states. (Pl.'s Opp. to Mot.

---

after Askari was fired from Onco360. (FAC at ¶ 88.) Therefore, facts regarding any claims made are peculiarly within Defendants' knowledge. Furthermore, there is a strong inference that Defendants made claims to the Government, especially given the allegation regarding 340B contracts. The same inference exists for the individual Defendants involvement in the scheme given the emails described in the complaint in which the individuals give direction and are kept abreast of the implementation of the different schemes.

to Dismiss, ECF No. 51 at 18.)  Askari specifically argues that Onco360's use of PharMerica's NPI resulted in false claims because its use required the certification that PharMerica was the dispensing pharmacy, which was not possible considering that PharMerica did not have contracts with 340B hospitals.  (*Id.*)

A claim is false if it is "aimed at extracting money the government otherwise would not have paid." *Mikes*, 274 F.3d at 696.  A claim can either be legally false or factually false.  *See Id.* The Work Around and OMPD scheme were allegedly legally false.  "There are two types of legally false claims: (i) express false certification claims and (ii) implied false certification claims." *United States ex rel. Gelbman v. City of New York*, 2018 WL 4761575, at *5 (S.D.N.Y. Sept. 30, 2018), *aff'd* 790 F. App'x 244 (2d Cir. 2019).  Express false certification occurs when defendants "certify[y] compliance with a statute or regulation as a condition to governmental payment, but is not actually compliant."  *Id.*  Implied false certification occurs when "a claim makes specific representations about the goods or services provided, but fails to disclose non-compliance with material statutory, regulatory, or contractual requirements that make those representations misleading with respect to those goods or services."  *Escobar*, 579 U.S. at 188.  Both theories require that there is an allegation of misrepresentation about "compliance with a federal statute or regulation or a prescribed contractual term" that is a prerequisite to payment.  *U.S. ex rel. Fox Rx, Inc. v. Dr. Reddy's Inc.*, 2014 WL 6750786, at *10 (S.D.N.Y. Dec. 1, 2014); *see also Escobar*, 579 U.S. at 191 ("A statement that misleadingly omits critical facts is a misrepresentation irrespective of whether the other party has expressly signaled the importance of the *qualifying* information.") (emphasis added).

9

####    i.    *The FAC does not allege a false claim*

Askari alleges both an express and implied false claim.  *See Gelbman*, 2018 WL 4761575 at *6 (reviewing both theories despite complaint failing to distinguish between the standards). However, regardless of which theory his allegations rest on, Askari's complaint fails to demonstrate how any of the alleged facts establish a false claim.  Specifically, just like in *Ramos*, Askari does not identify any controlling statute or regulation that Defendants violated as a result of the conduct alleged in the FAC.  *See Ramos*, 2020 WL 2512099 at *5.  This infirmity is fatal to his complaint.  *See Id.* at *4 (Relator failed to allege there was any specific eligibility requirement for reimbursement that Defendant failed to comply with).

While the FAC correctly describes relevant federal law, namely Medicare, Medicaid, and out-of-state pharmacy requirements, it fails to demonstrate how any of the laws prohibit Defendants conduct—a critical element of the claim.  Pharmacies participating in federal health programs like Medicare and Medicaid cannot submit claims for payment unless they comply with "all applicable State law requirements."  *See, e.g.*, 42 C.F.R. §423.100 and 42 C.F.R. §423.104(h). The FAC only makes vague reference to state regulations in discussing when out-of-state pharmacies can dispense prescriptions to in-state patients.  (*E.g.* FAC at ¶ 56.) These laws require, *inter alia*, an out-of-state pharmacy to register with the state board of pharmacy, that the head pharmacist in charge obtain a license from the state, or the pharmacy have a brick-and-mortar facility in the state.  (*Id.* at ¶¶ 47-57.)  In addition, the FAC makes an effort to demonstrate that the OMPD program at least violated NY state licensing laws.  The FAC alleges facts regarding Onco360's emails with the New York State Board of Pharmacy.  There, the FAC states that the NY Board told Onco360 it would be illegal to fill prescriptions from one NY location with a distinct NPI, but dispense and ship the prescriptions from another NY location with a different

NPI. (FAC at ¶ 97.) Onco360 allegedly understood this as NY proscribing "adjudicating [meaning *submitting claims for reimbursement* of] RXs under one NPI & shipping them out from a location with a different NPI…" (*Id.* (emphasis added).)

However, there is not one reference to laws prohibiting sublicenses: an out of state pharmacy from hiring an in-state pharmacy or a properly licensed out-of-state pharmacy to review and dispense the prescription. Therefore, there is no false claim alleged with respect to the Work Around and OMPD program. This is true despite the Work Around being concerned with Onco360 being the billing pharmacy but not the dispensing pharmacy.[3] As for the email with the New York state board, it seems to proscribe double-dipping: billing twice for the same prescription. However, this is not what the FAC alleges to be the OMPD scheme. Under the OMPD program, only the NPI from the pharmacy dispensing the prescriptions was being used to submit a claim to the government. Askari's failure to posit a single state law that proscribes the use of a properly licensed third party to dispense prescriptions in compliance with state laws is incurable and irreconcilable.[4]

### B. The Overbilling Scheme

Askari argues that the overbilling scheme is a factually false claim. (*See* ECF No. 51 at 21.) A factually false claim occurs when there is "an incorrect description of goods or services

[3] The FAC does not even make efforts to define dispense under the applicable state laws, a definition that is ostensibly necessary to analyze these schemes. For example, Lousisina defines dispense as "the interpretation, evaluation, and implementation of a prescription drug order, including the preparation and delivery of a drug or device to a patient or patient's agent…Dispense necessarily includes a transfer of possession of a drug or device to the patient or the patient's agent." La. Stat. Ann. § 37:1164 (12).

[4] Askari attempts to rely on the 340B contracts to argue the use of PharMerica's NPI was a false claim. But this argument suffers from a similar infirmity: the FAC does not provide a single allegation that a clause in the 340B contracts proscribe using third parties to dispense the prescriptions. The FAC states that the statutes creating the 340B contracts warn about criminal or civil penalties for violating federal, state, or local laws. (FAC at ¶ 39.) The FAC does not state any law or contract clause that Defendants scheme as alleged contravened. Even if there was a breach of contract, an alleged breach of contract does not give rise to a claim under the FCA unless the defendant allegedly certified compliance with that contract in connection with a claim for payment. *See, e.g., U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 824 (7th Cir. 2011). Askari does not allege this here.

provided or a request for reimbursement for goods or services never provided." *Gelbman*, 2018 WL 4761575 at \*5 (citing *Mikes*, 274 F.3d at 697).  A factual false claim can exist based on contract requirements.  For example, when a government contract requires certain goods and the government contractor claims they provided those goods, but in fact the goods were defective or otherwise nonconforming.  *See Bishop v. Wells Fargo & Co.*, 823 F.2d 35, 43 (2d Cir. 2016), vacated on other grounds, 137 S. Ct. 1067 (2017) ("Consistent with its origin, the archetypal FCA claim involves a factually false request for payment from the government, as when a contractor delivers a box of sawdust to the military but bills for a shipment of guns."); *see also*, CLAIRE M. SYLVIA, THE FALSE CLAIMS ACT: FRAUD AGAINST THE GOVERNMENT § 4:36 (June 2022 ed.) ("Defective or nonconfoming products were one of Congress's primary concerns when it first enacted the statute…").  However, there is a distinction between FCA allegations and breach of contract claims.  *See United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370. 373 (4th Cir. 2008) ("If every dispute involving contractual performance were to be transformed into a *qui tam* FCA suit, the prospect of litigation in government contracting would literally have no end.").  The allegations in the FCA are more so based in contract and are not FCA claims. Therefore, the FCA fails to plead that the overbilling scheme was a false claim.

The FAC alleges that PharMerica was submitting improper claims at the higher long-term care reimbursement rate for prescriptions it filled on behalf of Onco360's retail customers.  (FAC at ¶ 105.)  PharMerica submitted these claims based on its own contracts with PBMs providing for the long-term patient rate.  (*Id.*)  This allegedly was an incorrect description of the goods PharMerica provided.  However, the FAC does not state what the contract required with regards to billing, whether the payors knew the claims were premised on prescriptions dispensed for Onco30, or any other relevant detail.  Essentially, Askari argues that the claims are "false" because

the contract barred this type of claim without describing what the contracts allowed.  Given the lack of particularity, this theory of a factual false claim cannot stand.  *See United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 155 (D.D.C. 2011) (dismissing a FCA claim sounded in contract because the government cites no authority for this theory and "the difference between a breach of contract claim and an FCA claim could evaporate").  Therefore, the overbilling scheme alleged in the FAC is also dismissed.

## IV.   THE COMPLAINT FAILS TO PLEAD A REVERSE FALSE CLAIM

The FAC also alleges a "reverse false claim" pursuant to 31 U.S.C. § 3729(a)(1)(G).  (FAC at ¶ 114.)  This claim is premised on the notion that Defendants received money from government payors it otherwise should not have because of the schemes discussed above. Askari's "reverse false claim theory thus fails for the same reason that his other FCA claims fail."  As examined above, the FAC does not plausibly allege that Defendants submitted false claims to the federal government. Therefore, the FAC cannot plausibly allege that there was an obligation to pay back the government.[5]

## V.   LEAVE TO AMEND

Plaintiffs indicate in their briefing that should their claims be denied, they intend to move for leave to file an amended complaint. (ECF No. 51 at 27-28.)  Federal Rule of Civil Procedure 15(a) provides that a district court may grant leave to amend "freely . . . when justice so requires."  Fed. R. Civ. P. 15(a); *see also Perez v. 117 Ave. of the Ams. Food Corp.*, 2016 WL 5415090, at *1 (S.D.N.Y. Sept. 27, 2016) ("A district court has broad discretion in determining whether to grant leave to amend.") (citation omitted).  "Complaints dismissed under Rule9(b) are

---

[5] Given that the FAC fails to plead a false claim, the Court declines to examine the other elements of an FCA claim. In addition, given the dismissal of the federal claims, the Court declines to exercise supplemental jurisdiction over Askari's state-law 25 claims.

almost always dismissed with leave to amend." *Luce v. Edelstein*, 802 F.2d 49, 57 (2d Cir. 1986) (quotations omitted). Plaintiffs may submit, by letter application, a proposed amended complaint if such amendment would not be futile. However, Askari is warned that he can only cure the deficiencies in the FAC by providing a law, regulation, or rule that specifically prohibits Defendants actions. The letter application must be filed on or before October 15, 2022.

## VI. CONCLUSION

Defendants' motion to dismiss is GRANTED. Relator's claims are dismissed in their entirety without prejudice. The Clerk of Court is directed to close the pending motion, (ECF No. 44).

Dated:            , 2022
        New York, New York

SO ORDERED.

GEORGE B. DANIELS
UNITED STATES DISTRICT JUDGE

14

almost always dismissed with leave to amend." *Luce v. Edelstein*, 802 F.2d 49, 57 (2d Cir. 1986) (quotations omitted). Plaintiffs may submit, by letter application, a proposed amended complaint if such amendment would not be futile. However, Askari is warned that he can only cure the deficiencies in the FAC by providing a law, regulation, or rule that specifically prohibits Defendants actions. The letter application must be filed on or before October 17, 2022.

## VI.    CONCLUSION

Defendants' motion to dismiss is GRANTED. Relator's claims are dismissed in their entirety without prejudice. The Clerk of Court is directed to close the pending motion, (ECF No. 44).

Dated: September 15, 2022
       New York, New York

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS
UNITED STATES DISTRICT JUDGE

14